IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM A. FLETCHER, JR.[1], | § | |
| | § | |
| Petitioner-Below, | § | No. 566, 2019 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below – Family Court |
| | § | of the State of Delaware |
| MELISSA N. FEUTZ, | § | |
| | § | |
| Respondent-Below, | § | File No. CK05-02113 |
| Appellee. | § | Petition No. 18-01135 |
| | § | |
| | § | |
| | § | |

Submitted: October 28, 2020
Decided: January 22, 2021

Before **SEITZ**, Chief Justice; **VALIHURA** and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Family Court of Delaware. **AFFIRMED IN PART**, **REVERSED IN PART**, and **REMANDED IN PART**.

Bonnie Egan Copeland, Esquire, COPELAND TAYLOR LLC, Wilmington, Delaware; *for Appellant William A. Fletcher*

Gretchen S. Knight, Esquire and R. Eric Hacker, Esquire, MORRIS JAMES LLP, Wilmington, Delaware; *for Appellee Melissa N. Feutz.*

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

**MONTGOMERY-REEVES**, Justice:

William A. Fletcher, Jr. challenges the Family Court's denial of his petition to modify or terminate alimony payments to his ex-wife, Melissa N. Feutz. Fletcher argues that the Family Court erred by ruling that (i) Feutz was appropriately employed; (ii) there was not a substantial change in circumstances that warranted the termination or modification of alimony; (iii) Feutz was not cohabitating with her paramour; and (iv) Feutz was entitled to the attorney's fees awarded.

Having reviewed the parties' briefs and the record on appeal, this Court holds that the Family Court did not err in finding that Feutz was properly employed and that she was not cohabitating with her paramour. This Court remands the issue of whether there was a substantial change in circumstances. Finally, this Court holds that the Family Court erred in awarding Feutz attorney's fees for the defense of Fletcher's Motion to Modify or Terminate Alimony.

## I.    BACKGROUND

Fletcher and Feutz divorced on September 29, 2005, after twenty-nine years of marriage, and signed a Consent Order and Agreement (the "Agreement") dated January 22, 2007, to resolve matters ancillary to the divorce.[2]

---

[2] Appendix to the Opening Br. 262 (hereafter "A __").

Under the terms of the Agreement, Fletcher retains the marital residence in Smyrna, Delaware while Feutz retains the property in Rehoboth, Delaware.[3]

The Agreement also compels Fletcher to pay Feutz alimony in the amount of $2,250.00 per month.[4]  But, the Agreement provides three means by which Fletcher may seek to modify or terminate his alimony obligation.  First, Paragraph 18(a) provides that "[i]f not terminated earlier, [Fletcher's] alimony obligation to [Feutz] shall terminate upon the death of either party or the remarriage or cohabitation of [Feutz] as provided in 13 *Del. C.* § 1512(g)."[5]  Second, Paragraph 18(b) specifies that Fletcher can seek to modify or terminate his alimony obligation in a future proceeding based on the appropriateness of Feutz's employment, as defined in 13 *Del. C.* § 1512(e).[6]  Third, the Agreement states that "the alimony obligation provided for herein shall be subject to modification or termination as provided in 13 *Del. C.* § 1519(a)(4)[,]" which relates to a real and substantial change of circumstances.[7]

Fletcher filed his petition in January 2018, and Feutz answered in March 2018.[8]  The Family Court held trial on April 8, June 7, and June 25, 2019.  The pertinent facts warrant a breakdown focused on testimony from key witnesses.

---

[3] A263.
[4] A100.
[5] *Id* (emphasis added).
[6] A101.
[7] A100.
[8] Opening Br. 12.

2

### A. Melissa N. Feutz

Feutz is a certified teacher, and she taught for two years, from 2002-2004; however, she spent the bulk of her career (twenty-five plus years) employed in an administrative capacity.[9] At the time the parties entered into the Agreement, Feutz was earning $24,432 per year as a secretary with the Capital School District and had $4,128 in monthly expenses.[10] Feutz was promoted to senior secretary in 2006, which included additional responsibilities such as speaking to visitors, planning events, assisting with enrollment, and working closely with the principal.[11] Feutz testified that she received above-average performance evaluations.[12] In 2010, she received a pay increase of $13,981, which brought her yearly earnings to $42,921.[13] While she was employed, Feutz did not alert Fletcher of any increase in her income.[14]

On June 30, 2016, Feutz retired from her employment with the school. At the time she earned $1,808.31 biweekly, which equates to $47,016 annually.[15] Feutz was 57 at the time of retirement with 20.4 years of service.[16] She was entitled to a monthly pension payment of $1,096.16.[17]

---

[9] A227; A234.
[10] A263.
[11] A162-63.
[12] A170.
[13] A240 (Feutz's taxable earnings were $28,940 in 2009 and $42,921 in 2010).
[14] A484.
[15] A264.
[16] A169.
[17] *Id.*

Feutz cites serious fatigue due to chronic insomnia and anxiety as the reason for her early retirement.[18]  She experienced numerous traumatic events in a short amount of time, namely the death of her son (which resulted from an opioid overdose), the loss of her marriage, and the death of her father.[19]  Feutz attended counseling from 2004-2008 and took medication for depression and anxiety.  She stopped taking this medication and refused other medicinal treatment due to the fear of dependence caused by her son's opioid overdose.[20]

Feutz continued to build a productive career, but her symptoms persisted.  Feutz testified that her insomnia began to affect her work by inhibiting her ability to handle her duties, especially in the afternoon.  For example, Feutz testified about an incident where, due to her symptoms, she accidentally released a child into the custody of the wrong parent in violation of a Family Court order.[21]  She also testified about having to pull off the road during her commute due to her fatigue.[22]

Feutz also had thyroid cancer and, as a result, had her thyroid removed.  She takes Synthroid or the generic equivalent.[23]  But, she has declined to attend routine follow-up

---

[18] A171-73; A457.
[19] Appendix to the Answering Br. 025-26 (hereafter "B__").
[20] B034.
[21] B036-37; *see also* A346-48.
[22] B035.
[23] A478.

appointments or see any doctor because she "[does not] go to the doctors hardly ever for anything."[24] Feutz had resumed therapy as of the time of the trial.[25]

Feutz offered no objective corroborating medical evidence regarding her mental or physical health.[26] Instead, she proffered testimony of her former boss at Capital School District, Kevin Brown,[27] and of her sister-in-law, retired Superior Court Judge Jane Brady.[28] Both testified about witnessing Feutz's struggles with insomnia and anxiety. And both corroborated Feutz's details about the effects of the insomnia on her, especially with the performance of her job and her commute. But neither witness had a medical background.

After her retirement, Feutz had a job offer closer to her home, but it fell through before she began working. She did not seek other employment in 2016. She began babysitting for a family friend in 2017, but she refused pay and only accepted gift cards. Feutz did not seek other employment until April 2018, after she filed her Answer to Fletcher's Petition.[29] In May 2018, Feutz received an offer from Troop 7 in Lewes, Delaware for a seasonal part-time clerical position earning $13.43 per hour.[30] She works on average 29.5 hours each week

---

[24] A476.
[25] A479.
[26] A172.
[27] A353; A359; A398.
[28] A402-16.
[29] A180-82.
[30] A264.

and receives biweekly paychecks of $792.76.[31]  In addition to this income, Feutz receives her monthly pension.[32]

Feutz also had a tenant from May 2018 to April 2019, who helped around the house but did not pay rent.[33]  Feutz planned to have another tenant reside with her beginning in June 2019 and expected to have the same arrangement.

Feutz testified that even though she tried to live within her means, money was still tight.[34]  Feutz claims her current expenses total $4,047.64.[35]  To meet her financial needs in 2017, she withdrew approximately $12,365.97 from her investment account.[36]  In 2018, she had to rely on a partial disbursement of her IRA and her new position with Troop 7.[37]  Feutz acknowledged that working, instead of withdrawing these sums, would have been the prudent course of action.[38]  Concerning the $150,000 dollar lump sum payment she received under the Agreement, Feutz testified that she used this money primarily for home improvements and maintenance.[39]  She states her current living standard is below the standard of living she enjoyed while married to Fletcher.[40]

---

[31] *Id.*
[32] A098-99; A235-36.
[33] A204-05.
[34] A458-59.
[35] A255.
[36] Opening Br. Ex. C, at 9.
[37] *Id.*
[38] A207.
[39] A206.
[40] A458-59.

Regarding her paramour, Feutz and her partner began an exclusive relationship in 2007 or 2008. They often go out together publicly and hold themselves out as a couple.[41] They began spending the night together in 2010.[42] Both maintain separate residences as Feutz resides in Rehoboth while her partner lives and works in Dover. Due to her partner's demanding work schedule, and being on call every sixth or seventh weekend, the couple typically spends free weekends together at either house.[43] They typically spend Saturday afternoon or evening to Sunday morning or afternoon together. Both partners have keys to the other's house, and either partner will use the key if the other cannot answer the door.[44] However, neither partner will enter the other's residence without permission.[45]

The couple enjoys bike riding, going to the movies, attending auctions, cooking, and entertaining family and friends.[46] They have gone on numerous vacations and have spent holidays together.[47] Feutz's partner helps with errands and helps pay when they go out to eat.[48] But, the partner does not pay any portion of the utilities or mortgage for the Rehoboth residence. Feutz's burial policy lists her partner as the beneficiary.[49]

---

[41] A265 (the parties stipulated to this fact).
[42] A210-11.
[43] *Id.*
[44] A213.
[45] A285-86.
[46] A486.
[47] A214-15.
[48] A213-18; A221.
[49] A216.

## B. William A. Fletcher Jr.

In 2006, Fletcher owned Fletcher Funeral Directors ("FFD"); his annual income was between $90,000 and $100,000; and his monthly expenses were $6,221.[50] When he filed the Petition to Terminate or Modify, Fletcher still owned and operated FFD.[51] In 2017, Fletcher's annual income consisted of a $140,362 salary plus $18,000 in rent and $11,687 in business income, totaling $170,049.[52]

Fletcher sold FFD to his niece and her husband in June 2018 for $3,177,824.25 and received a promissory note of $300,000 payable on November 9, 2021.[53] Fletcher decided to sell the business due to a change in the business and personal health issues.[54] Fletcher continues to work as a consultant at FFD and earns $2,500 per month.[55] FFD also covers Fletcher's gas expenses, health insurance, and funds due to Fletcher's mother from the business which he receives and then transfers after taxes to his mother.[56] Fletcher's total income for his consultant work is $76,180.56.[57]

---

[50] A263.

[51] A311; A264.

[52] A264.

[53] A265.

[54] A314 (Fletcher suffers from severe back pain and has trouble ambulating or lifting anything heavier than 25 pounds. He also suffers from carpal tunnel syndrome).

[55] *Id.*

[56] *Id.*

[57] *Id.*

Fletcher remarried on March 10, 2010. His wife is currently on disability due to cancer and is unable to contribute to household expenses.[58] Fletcher is the primary caretaker for his wife.

Fletcher's investments total approximately $2,400,000. He also owns numerous recreational vehicles, such as boats and four-wheelers, a car, an SUV, and a Ram Rebel. He and his wife recently purchased a new beach house.

Fletcher testified that he knew in 2016 that Feutz retired early because he began receiving his share of her pension. Fletcher stated that Feutz never contacted him concerning her retirement or any change in position or income.[59] Fletcher also acknowledged that he never reached out to inquire why he began to receive these payments. Fletcher testified that he did not file a Petition to Terminate or Modify Alimony earlier due to his time-consuming commitment to his wife.[60] Fletcher testified in his deposition, however, that he was advised to wait until he had a substantial change in circumstances. He indicated at the deposition that his recent beach house purchase was one reason for the purported substantial change in circumstances.[61]

---

[58] A325.
[59] A331-32.
[60] A332.
[61] Opening Br. Ex. C, at 16.

## C. Additional Testimony

In support of his case, Fletcher called a vocational expert, Jose Castro. Castro is a certified rehabilitation counselor.[62] He utilized Feutz's resume, deposition transcripts, data from Capital School District, wage statements, online job-hunting software, and in-person interviews to complete his report.[63] After his evaluation of Feutz, Castro opined that Feutz was capable of working and earning more.[64]

Castro stated that he typically examines a subject's earning capacity based on full-time employment unless he is presented with evidence that indicates the person cannot work full time.[65] Castro examined full-time secretarial and clerical jobs in both the Rehoboth and Dover areas.[66] Castro concluded that Feutz should be earning in the $45,000 to $47,000 range.[67] Castro admitted that he did not identify any full-time position in the Rehoboth area that would meet Feutz's qualifications or that paid in that range.[68]

Castro admitted that his report discounted Feutz's tiredness and whether she was merely tired of the commute or was tired to the point she could not handle the commute.[69]

---

[62] A131.
[63] A132-33.
[64] A233.
[65] A135.
[66] *Id.*
[67] A233.
[68] A156.
[69] A146.

Castro emphasized that he had no medical information to verify Feutz's claims of insomnia and anxiety.[70]

### D. The Family Court's Ruling

After trial, the Family Court held that: (1) Feutz's part-time clerical work for Troop 7 was appropriate employment; (2) there was not a substantial change in circumstances; and (3) Feutz and her paramour were not cohabiting. The Family Court also granted Feutz attorney's fees for her defense of the Petition to Terminate or Modify Alimony. Fletcher appeals these rulings.

## II. STANDARD OF REVIEW

On appeal from a Family Court decision awarding alimony, we review the facts and the law, as well as the inferences and deductions made by the trial judge. We review rulings of law *de novo*.[71] We conduct a limited review of factual findings of the Family Court to confirm that they are supported by the record and are not clearly erroneous.[72] This Court will not disturb inferences and deductions that are supported by the record and that are the product of an orderly and logical deductive process.[73] If the Family Court correctly applied the law, our review is limited to determining if there was an abuse of discretion.[74]

---

[70] A149-56.
[71] *Brown v. Div. of Fam. Servs.*, 14 A.3d 507, 509 (Del. 2011) (citing *Powell v. Dep't of Servs. for Child., Youth & their Families*, 963 A.2d 724, 730 (Del. 2008)).
[72] *Stewart v. Stewart*, 41 A.3d 401, 404 (Del. 2012).
[73] *Id.*
[74] *Stearns v. Div. of Fam. Servs.*, 23 A.3d 137, 141 (Del. 2011); *Hitchens v. Hitchens*, 1991 WL 165556, at *2 (Del. Aug. 9, 1991).

## III. ANALYSIS

The Agreement at issue sets alimony but provides three means by which Fletcher may seek to modify or terminate his alimony obligation: (1) Fletcher may seek to modify or terminate his alimony obligation based on the appropriateness of Feutz's employment, as defined in 13 *Del. C.* § 1512(e);[75] (2) Fletcher may seek to modify or terminate his alimony obligation due to a real and substantial change of circumstances, as set forth in 13 *Del. C.* § 1519(a)(4);[76] and (3) Fletcher's alimony obligation terminates upon the cohabitation of Feutz with another adult, as provided in 13 *Del. C.* § 1512(g).[77]

Fletcher argues that the Family Court erred in concluding that Fletcher was not entitled to a modification or termination of his alimony obligations under either of these three circumstances and that Feutz was due attorney's fees. We address each argument in turn.

### A. Appropriate Employment

Permanent alimony, once established, remains effective for so long as the alimony recipient remains dependent and unable to support himself or herself through appropriate employment.[78] Recipients of alimony have a continuing affirmative obligation to make a good faith effort to seek appropriate employment unless the court finds, after a hearing, that it would be inequitable to do so due to a severe and incapacitating physical or mental

---

[75] A101.
[76] A100.
[77] *Id.*
[78] 13 *Del. C.* § 1512(b)(3).

illness.[79]  However, this statute does not require full-time employment, and there is no rule that in every case it is appropriate to impute to a spouse full-time employment when part-time employment is the best that can be done.[80]

Fletcher argues that the Family Court erred in finding that Feutz has a severe and incapacitating illness and therefore is appropriately employed because: (i) Feutz failed to provide any medical evidence to support her claim that medical issues prevented her from working full time, and (ii) the court disregarded unrefuted expert testimony from a vocational evaluator that Feutz could work full time and make $45,000-47,000 a year.

### 1. Evidence of Mental or Physical Impairment

Fletcher contends that the Family Court erred in finding Feutz suffered from a severe and incapacitating mental or physical illness or disability.  Specifically, Fletcher contends that "[m]edical testimony or objective evidence is necessary to prove a severe or incapacitating illness or disability."[81]  Fletcher identifies at least two cases that decline to find a severe and incapacitating mental or physical impairment absent medical evidence confirming the same at the time of the hearing.[82]  But Fletcher fails to identify a case prohibiting the Family Court from making such a finding in the absence of medical evidence.

---

[79] 13 *Del. C.* § 1512(e).

[80] *Macintosh v. Macintosh*, 2018 WL 1747798, at *4-5 (Del. Apr. 11, 2018).

[81] Opening Br. 11 (citing *W.J.F. v. K.F.*, 2008 WL 2898764, at *4 (Del. Fam. Ct. Jan. 15, 2008)); *CLJ v. BGJ*, 2001 WL 493121, at *3 (Del. Fam. Ct. Jan. 29, 2001); *Downing v. Downing*, 2000 WL 33403043, at *3-4 (Del. Fam. Ct. Feb. 1, 2020).

[82] *Downing*, 2000 WL 33404043, at *4; *L.J. v. B.G.J.*, 2001 WL 493121, at *3 (Del. Fam. Ct. Jan. 29, 2001).

13

Here, the Family Court had before it: (i) testimony from Feutz that she received medical treatment for four years for anxiety and depression and took medication for the same immediately after her son's death, her divorce, and her father's death, but she quit taking the medication for fear of addiction (her son died of an overdose) and eventually quit therapy as well; (ii) testimony from Feutz that she suffered from anxiety and severe insomnia, which caused her difficulty in doing her job and made her commute dangerous in the 2016 timeframe; (iii) testimony that Feutz continues to deal with insomnia and anxiety; (iv) testimony that Feutz has resumed therapy; (v) testimony from Feutz's former boss corroborating her insomnia allegations in the 2016 timeframe; and (vi) testimony from Feutz's sister-in-law corroborating her insomnia and anxiety allegations. The Family Court determined Feutz was impaired under 13 *Del. C.* § 1512(e) after weighing the evidence in the record and assessing the credibility of the witnesses.

A review of Family Court cases addressing 13 *Del. C.* § 1512(e)(1) suggests that the court typically requires objective medical evidence as proof of a severe and incapacitating mental or physical illness or disability.[83] We believe this reflects best practice, and nothing in this opinion should be read to suggest otherwise. However, obtaining corroborating

---

[83] *Compare G.M.A. v. S.R.*, 2005 WL 3514310, at *1-2 (Del. Fam. Ct. Aug. 21, 2005); *N.J.D. v. C.A.D.*, 2001 WL 1857142, at *1 (Del. Fam. Ct. Dec. 5, 2001); *Fessman v. Fessman*, 2000 WL 1072477, at *6 (Del. Fam. Ct. Jan. 5, 2000); *Reinholz v. Reinholz*, 2000 WL 1693148, at *4 (Del. Fam. Ct. Jan. 28, 2000); *Downing*, 2000 WL 33403043, at *3-4; *with JPK v. JDK*, 2011 WL 7789567, *6-12 (Del. Fam. Ct. Oct. 25, 2011); *PA.M. v. R.L.M.*, 2007 WL 4793039 (Del. Fam. Ct. Nov. 2, 2007).

objective medical evidence, while best practice, is not a prerequisite to a determination that an individual suffers from a severe and incapacitating mental or physical disability. Although we can envision scenarios in which accepting non-medical evidence alone as sufficient proof of a severe and incapacitating mental or physical illness or disability might constitute a reversible error, this Court is not willing to adopt a blanket rule that requires objective medical evidence in all cases. Instead, we believe the Family Court should retain the ability to weigh all evidence provided (medical or otherwise) to determine whether a severe and incapacitating mental or physical illness exists. Stated differently, the Family Court should have leeway to make those determinations based on the evidence before it.

After sitting through a three-day trial, observing the witnesses, assessing their credibility, and examining the evidence, the Family Court determined the witnesses were credible and the evidence was reliable and sufficient to establish that Feutz suffers from a severe and incapacitating mental or physical disability. The live testimony from Feutz, Brown, and Brady substantiates Feutz's struggles, and Fletcher has not identified contrary evidence. While we believe this evidence is thin, we do not believe the Family Court committed reversible error in assessing the credibility, weighing the evidence, and determining that Feutz was impaired under the circumstances of this case.

### 2. Vocational Expert Testimony

Fletcher next argues that the Family Court erred by disregarding the unrefuted expert testimony of a vocational evaluator that Feutz could work full time and make $45,000-47,000 a year.

"The law requires the trial judge to weigh the evidence, including the credibility of live witness testimony."[84] This includes any report, testimony, or other evidence offered by an expert.[85] Here, the Family Court spent five pages of its Amended Final Order considering Castro's conclusions. After hearing the direct and cross examination of Castro, the Family Court found that Castro's conclusions were tainted by confirmation bias because Castro admittedly excluded data that did not support his conclusions or Fletcher's position.[86] For example, Castro's report did not consider the lower rate of pay in the Rehoboth market or the lack of full-time positions in the Rehoboth area. Castro only considered available full-time jobs in Dover and Frederica. Castro discounted Feutz's medical condition, stating that

---

[84] *Gatz Props, LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1221 (Del. 2012); *Hudak v. Procek*, 806 A.2d 140, 150 (Del. 2002) ("Regardless of the applicable standard of proof at trial, this Court regularly defers to the unique opportunity of the fact-finder, whether judge or jury, to evaluate the live witnesses, to evaluate their demeanor and credibility and to resolve conflicts in the testimony . . . .The weight to be given to evidence, however, is for the trier of fact to determine." (footnotes omitted)); *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000) ("When factual findings are based on determinations regarding the credibility of witnesses, however, the deference already required by the clearly erroneous standard of appellate review is enhanced." (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)).

[85] *Ng v. Heng Sang Realty Corp.*, 2004 WL 1192091, at *5 (Del. May 20, 2004) ("The Court is free to accept, reject, or give whatever weight to expert opinion testimony that it deems appropriate.").

[86] Opening Br. Ex. C, at 35-36.

"if her symptoms were that bad why wouldn't she have treated with someone."[87] Thus, the record reveals multiple instances in which cross examination exposed gaps in Castro's analysis.[88] The court's "fact-finding role allows it to consider reliable and credible expert testimony and to reject unreliable or incredible expert testimony."[89] The Family Court did not err in finding that Castro lacked credibility and discounting Castro's report and testimony.

### 3. Employment

Fletcher argues that Feutz is not appropriately employed because she is currently working part time in Rehoboth making $13.43 an hour instead of working full time in Dover making between $45,000 and $47,000 a year. We do not find this argument convincing.

As discussed above, the Family Court found credible Feutz's testimony that she retired from full-time employment because her persistent anxiety and insomnia prevented her from commuting from Rehoboth to Dover and affected her performance in the afternoons. The concurring testimony of Brown and Brady further bolstered Feutz's credibility.

Additionally, Castro admitted that he found no full-time positions available in the Rehoboth area at her skill level. He only found "suitable" positions in Frederica and Dover, each approximately an hour drive away. Castro also admitted on cross examination that the

---

[87] A152.
[88] A149-56.
[89] *Kruse v. Synapse Wireless, Inc.*, 2020 WL 3969386, at *8 (Del. Ch. July 14, 2020).

pay in the Rehoboth area is less, and what Feutz makes now is consistent with what is available in that area.

Finally, the pay at Feutz's part-time job is comparable to what Feutz was making in 2006. With her pension factored in, Feutz's annual earnings are approximately $33,000. Given the circumstances, the Family Court did not err in determining that Feutz had adequate employment.

## B. A Real or Substantial Change in Circumstances

Fletcher also argues that the Family Court abused its discretion in concluding that there was not a substantial change in circumstances under 13 *Del. C.* § 1519(a)(4) because the court failed to (i) account for an adult living in Feutz's home and (ii) consider significant reductions in Feutz's expenses relative to increases in her income.

The Agreement states in Paragraph 18(a) that "the alimony obligation provided for herein shall be subject to modification or termination as provided in 13 *Del. C.* § 1519(a)(4)."[90] Under Section 1519(a)(4), the Court may modify or terminate an existing alimony obligation if the moving party shows that there has been a real and substantial change in circumstances. To determine whether a real and substantial change of circumstances has occurred, the Court must measure the parties' current economic circumstances against the economic circumstances at the time the underlying order was

---

[90] A100.

18

entered.[91]  "The showing of the substantial change of circumstances necessary to warrant modification of the original award must be such as to convince the Court that to enforce the award would produce an undue hardship to the obligor or an undue benefit to the obligee."[92]

### 1.    The Tenant

It is undisputed that a tenant resided with Feutz from May 2018 to April 2019. Fletcher argues that rental income should have been attributed to Feutz, relying on multiple Family Court cases that attribute rental income to the party who has an adult individual residing with them.[93]  Feutz responds that no adjustment was necessary because the tenant performed household duties in exchange for living with Feutz, which reduced Feutz's expenses.  Further, Feutz argues that Fletcher failed to provide any evidence during trial to support his proposed rent adjustment. [94]  Finally, Feutz contends that

> if the Family Court were required to undertake the sort of granular analysis Ex-Husband suggests, it likely would have been to Ex-Husband's detriment. After all, Ex-Husband's expense sheet does not differentiate between his expenses or his new wife's expenses; nor does his income include attribution for investment proceeds from the sale of his business or for his wife's "rent" for their primary residence or their beach house.[95]

---

[91] *Husband, J. v. Wife, J.*, 413 A.2d 1267, 1270 (Del. Fam. Ct. 1979).
[92] *Id.*
[93] Opening Br. 33-34 (citing *A.G. v. B.G.*, 2018 WL 4177539, at *3 n.9 (Del. Fam. Ct. Apr. 17, 2018); *B.O. v. S.O.*, 2007 WL 3171840, at *7 (Del. Fam. Ct. June 11, 2007); *In re Marriage of DeLuca*, 1998 WL 668017, at *1-2, *5 (Del. Fam. Ct. Apr. 4, 1998)).
[94] Answering Br. 32-34.
[95] *Id.* at 34.

The Amended Final Order does not appear to address any of these arguments.[96]  Therefore, we remand this dispute to the Family Court to resolve in the first instance whether any rental income should be attributed to Feutz given her arrangement with the tenant and the other arguments that Feutz raises in response to Fletcher's position.  If the court attributes any income to Feutz, then the court should also determine whether that income would constitute a real and substantial change under 13 *Del. C.* § 1519(a)(4).

### 2.  Reduced Expenses

Fletcher also argues that Feutz is substantially better off than she was at the time of divorce because her income increased by 38% from $24,432 to $33,755 annually, while her monthly expenses decreased by 13% from $4,128 to $3,557.  Thus, he argues that the Family Court erroneously concluded there has been no substantial change in Feutz's circumstances.[97]

Fletcher earns about 58% more than Feutz earns.[98]  Comparatively, at the time of divorce, the disparity was approximately 72-75%.[99]  This represents a 14% to 17% decrease.  Family Court case law has established that a 17% change in the relative economic positions of the parties does not amount to a substantial change in circumstances, even when the

---

[96] Opening Br. Ex. C, at 40-44.
[97] Opening Br. Ex. B, at 7-8.
[98] *Id*. at 8.
[99] *Id.*

20

alimony recipient enjoys a 98% increase in income.[100] More recent Family Court case law establishes that a 15% increase or decrease in either party's income or expenses does not amount to a real and substantial change in circumstances.[101] The Family Court did not err in this section of its analysis.

Fletcher argues, however, that the Family Court failed to adequately consider the change in Feutz's expenses and how that change affects her economic position when compared to the increase in annual income.[102] We agree.

As the Family Court has held, when determining whether a real and substantial change of circumstances has occurred, the Family Court

> must examine the respondent's current economic status measured against her economic status at the time of the original order if one is to make a determination of substantial change. To stop the inquiry at this point, however, is not satisfactory, for an equally relevant inquiry is the relative economic circumstances of the parties. For example, a substantial reduction in the obligor's income may not require a modification of the award where there has been an increase in the obligee's needs. Similarly, an increase in the obligee's income will not require a modification of the award where the obligor's income has also increased or where the obligor's collateral obligations have been decreased.[103]

---

[100] *Husband, J.*, 413 A.2d at 1270.
[101] *Forbes v. Forbes*, 1998 WL 1035243, at \*3 (Del. Fam. Ct. Dec. 2, 1998); *Jones v. Jones*, Del. Fam. Ct., File No. CN92-8995, Ableman, J. (June 2, 1995), slip op.
[102] Opening Br. 34-36.
[103] *Husband, J.*, 413 A.2d at 1270.

Here, the Family Court, in its Reargument Order, states that

> Ex-Wife's reasonable monthly expenses total $3,557.64. When comparing this amount to her monthly expenses of $4,128.00 at the time of divorce, there has been a 13% decrease in her expenses. This decrease, however, is not a sufficient enough change to warrant it being considered a real and substantial change in circumstances. Family Court case law authority establishes that a 15% increase or decrease in an alimony recipient's income does not amount to a real and substantial change in circumstances. Ex-Husband's claim that this reduction in expenses amounts to a substantial change in circumstances is without merit.[104]

However, in the Amended Final Order, the Family Court failed to correct the amount

of Feutz's expenses. The Family Court's Amended Final Order states,

> In 2006, Ex-Wife was earning $24,432 annually and her monthly expenses totaled $4,128. Ex-Wife earns about $20,601.62 annually from her employment with Troop 7 and $13,153.92 in annual pension income. Ex-Wife's annual income is about $33,755.54. *Ex-Wife's monthly expenses are about $4,004.64. Ex-Wife experienced about a 38% increase in her income and her expenses remained almost the same. Despite an increase in Ex-Wife's income, the parties' relative economic positions remain fairly similar.* In 2007, Ex-Husband was earning between $90,000 and $100,000, 72% to 75% more than Ex-Wife was earning. Ex-Husband earns about $80,144.28 in annual income from various sources, about 58% more than Ex-Wife earns.
>
> The Family Court has held that a 17% change in the relative economic positions of the parties does not amount to a substantial change in circumstances, even when the alimony recipient enjoys a 98% increase in income. Similarly, the Family Court has held that a 15% decrease or increase in an alimony recipient's income does not amount to a real and

---

[104] Opening Br. Ex. B, at 7-8.

substantial change in circumstances. The evidence demonstrates there has been almost no change in the parties' relative economic circumstances, *despite an increase in Ex-Wife's income*. The Court finds that Ex-Husband has failed to demonstrate there has been a real and substantial change in circumstances. The Court also finds that Ex-Wife does not receive an undue benefit from continuing Ex-Husband's alimony obligation because she is appropriately employed but still unable to support herself.[105]

Thus, in the Reargument Order, the Family Court only considers the decrease in expenses in a vacuum, failing to compare that decrease in expenses with Feutz's increase in income to determine her overall economic position. In the Amended Final Order, the Family Court considers Feutz's income and expenses together and analyzes the change in the relative economic positions of the parties, but the court uses an incorrect amount for Feutz's expenses.

Therefore, we also remand this dispute to the Family Court to determine whether the relative increase in Feutz's income compared to her decrease in expenses constitutes a substantial change in circumstances under 13 *Del. C.* § 1519(a)(4).[106]

## C.    Cohabitation

Fletcher argues that the Family Court erred in concluding that Feutz and her paramour do not cohabitate because they spend every weekend together and share some household chores.

---

[105] Opening Br. Ex. C, at 43-44 (emphasis added).
[106] We note that Feutz's income could change if the Family Court attributes to her any rental income.

23

Paragraph 18(a) of the Agreement provides that Fletcher's alimony obligations terminate upon a showing that Feutz cohabitated as defined in 13 *Del. C.* § 1512(g). Cohabitation means "regularly residing with an adult of the same or opposite sex, if the parties hold themselves out as a couple, and regardless of whether the relationship confers a financial benefit on the party receiving alimony."[107] The couple stipulated they hold themselves out as a couple.[108] The focus of this appeal is whether they regularly resided together. Regularly residing has been defined as living together with some degree of continuity.[109] Two people may regularly reside together even though they maintain separate residences.[110]

The Family Court held that the partners were in a committed dating relationship but not legally cohabiting. The record shows that they routinely spent weekends together, vacationed together, entertained, helped each other with household chores, have keys to each other's separate homes, and will enter the home if the other is not able to get the door. Additionally, Feutz's partner is named as a beneficiary for her burial policy. Conversely, the partners do not contribute money to each other's mortgage or utilities, spend the majority of their non-working time apart, do not leave personal items at each other's house, and ask

---

[107] 13 *Del. C.* § 1512(g).
[108] A262.
[109] *Paul v. Paul*, 60 A.3d 1080, 1083 (Del. 2012); *cf, Andrews v. Andrews*, 16 A.3d 937 (Del. 2011); *E.M. v. C.M.*, 2007 WL 5361877, at *4 (Del. Fam. Ct. Dec. 21, 2007).
[110] *Paul*, 60 A.3d at 1083.

permission to visit the other's home. The couple also lack any joint account, or shared expenses, of any kind.

With these facts in mind, the Family Court's holding that Feutz and her partner were not cohabiting is sufficiently supported by the record. On balance, the court did not err in determining that their conduct evidences a couple that enjoys short trips to each other's homes, rather than a couple that resides together. Thus, this Court affirms the Family Court's determination that Feutz and her paramour were not cohabitating.

### D. Attorney's Fees

Fletcher argues that both parties waived their rights to attorney's fees under Paragraph 21 of the Agreement.[111] That paragraph provides:

> Each party accepts the terms of this Agreement as provided herein in full settlement and satisfaction of any and all claims and rights against the other whatsoever (including but not by way of limitation, dower, curtesy, spousal support, alimony, suit money, attorneys' fees and all rights under the laws of testacy and intestacy) which he or she had, now has or ever have, against the other . . . by reason of their relationship as husband and wife or otherwise.[112]

Agreements resolving ancillary matters to a divorce are controlled by contract principles.[113] "Delaware law adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third

---

[111] Opening Br. 46.

[112] A101.

[113] *Rockwell v. Rockwell*, 681 A.2d 1017, 1020 (Del. 1996).

party."[114]  "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[115]  The terms of the contract control "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[116] "[W]hen we may reasonably ascribe multiple and different interpretations of a contract, we will find that the contract is ambiguous."[117]  "The parties' steadfast disagreement will not, alone, render [a] contract ambiguous."[118]

Paragraph 21 of the Agreement is clear and unambiguous.  According to the plain language of this paragraph, each party grants a broad and unqualified release of any and all claims and rights (including the right to attorney's fees) whatsoever which he or she had, now has or ever have, against the other.  The court identifies a whereas clause, which states that "the parties intend this Agreement to be in full settlement and release of all ancillary and other pending matters in the aforesaid divorce proceedings," as evidence that the release

---

[114] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[115] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[116] *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[117] *Osborn ex rel. Osborn*, 991 A.2d at 1159.

[118] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

relates only to the then pending divorce proceedings.[119]   "Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument.  If the recitals are inconsistent with the operative or granting part, the latter controls."[120]   But there is no apparent doubt to explain in the operative or granting part of the contract at issue here.  As such, the whereas clause may not limit the operative, granting language of the contract.

Feutz next argues that Fletcher's interpretation of Paragraph 21 is too broad when considered with the clauses that preserve the right to seek modification or termination of the alimony obligation based on Sections 1512 and 1519.[121]  By adopting the right to modify or terminate alimony for reasons set forth in the statute, Feutz argues that the parties also intended to adopt the right to seek attorney's fees under Section 1515 in connection with those applications.[122]   But this Court has warned that "[i]mplying terms into a written contract should be a cautious enterprise."[123]  "Further, the parties' intentions as reflected in the four corners of the agreement are given priority.  Implying terms that the parties did not expressly include risks upsetting the economic balance of rights and obligations that the contracting parties bargained for in their agreement."[124]  This reasoning is particularly

---

[119] Opening Br. Ex. B, at 3.

[120] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *13 (Del. Ch. Aug. 19, 2019), *aff'd*, 2020 WL 7223313 (Del. Dec. 8, 2020).

[121] Answering Br. 46.

[122] *Id.*

[123] *Murfey v. WHC Ventures*, 236 A.3d 337, 350 (Del. 2020).

[124] *Id.* (citation omitted).

applicable here, where the parties expressly considered and incorporated numerous sections of the Divorce and Annulment statute but did not include others.  Thus, this Court reverses the Family Court's award of attorney's fees.

## IV.    CONCLUSION

Based on the foregoing, the Family Court's December 2, 2019 Amended Final Order is AFFIRMED IN PART, REVERSED IN PART, and REMANDED IN PART.  The Family Court's December 16, 2019 Order is REVERSED.