Marie BROWN, Petitioner
Below, Appellant,

v.

DIVISION OF FAMILY SERVICES,
Respondent Below, Appellee.

John Roberts, Petitioner
Below, Appellant,

v.

Division of Family Services,
Respondent Below,
Appellee.

Nos. 536, 2010, 537, 2010.

Supreme Court of Delaware.

Submitted: Feb. 23, 2011.
Decided: March 3, 2011.

**508**

David J.J. Facciolo, Esquire, Minster & Facciolo, LLC, Wilmington, Delaware, and Judith Malcolmson Jones, Esquire, Berkowitz, Schagrin & Jones, P.A., Wilmington, Delaware, for appellants.

Kelly E. Farnan, Esquire, Richards, Layton & Finger, Wilmington, Delaware, and Todd Goodman, Esquire, Pepco Holdings, Inc., Wilmington, Delaware, guardian ad litem.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

The respondents-appellants, Marie Brown (the "Mother") and John Roberts (the "Father") (collectively, the "Respondents"), appeal from a Family Court judgment, which granted a Division of Family Services ("DFS") petition for the termination of the Respondents' parental rights in their son, Nathan. The Respondents raise three arguments on appeal. First, the Respondents contend that the Family Court erred by not considering the Mother's incarceration in its "failure to plan" analysis. Second, the Respondents contend that the Family Court erred in terminating their parental rights because they were "reasonably foreseeably capable of reunification with [Nathan] and had substantially completed case plan elements." Third, the Respondents contend that the Family Court abused its discretion in concluding that it was in Nathan's best interest to terminate the Respondents' parental rights.

We find that the Respondents' arguments are without merit. Therefore, the judgment of the Family Court must be affirmed.

***Facts***

The history of this case began with an unfortunate event that occurred over three years ago. One evening, Nathan's three-month-old twin sister was left on an air mattress with an older sibling and cousin. Nathan's twin sister was later found to be unresponsive and with blood on her pillow.

She had suffocated to death. The Respondents were aware that she was left on the air mattress instead of her crib. The Mother was charged with felony Endangering the Welfare of a Child, and she later pled guilty to misdemeanor Endangering the Welfare of a Child. Around that time, Respondents also tested positive for substance abuse.

After the death of Nathan's twin sister, the Family Court held a preliminary protective hearing, where it found that Nathan was dependent and granted custody of Nathan to the Department of Services for Children, Youth and Their Families ("DSCYF"). Thereafter, the Family Court held an adjudicatory hearing, where Respondents stipulated that Nathan was dependent and the Family Court ordered that custody of Nathan remain with DSCYF. Later, the Family Court held a dispositional hearing, where Respondents executed reunification plans and the Family Court again continued custody of Nathan with DSCYF.

The Family Court granted a subsequent motion by DFS to change the goal from reunification to concurrent planning for reunification or termination of parental rights. DFS eventually filed petitions for the termination of the Respondents' parental rights. The Family Court held hearings on those petitions over the course of four days. Thereafter, the Family Court issued its decision, concluding that the Respondents had failed to plan adequately for

Nathan and that it was in Nathan's best interest for the Respondents' parental rights to be terminated. This appeal followed.[1]

### Standard of Review

■■■ Our standard and scope of appellate review involves a consideration of the facts and law, as well as the inferences and deductions made by the Family Court.[2] To the extent that the issues on appeal implicate rulings of law, the standard of review is *de novo*.[3] To the extent that the issues on appeal implicate rulings of fact, we must examine the factual findings of the Family Court to ascertain that they are supported by the record and are not clearly wrong.[4] We will not disturb inferences and deductions that are supported by the record and that are the product of an orderly and logical reasoning process.[5] If the Family Court has correctly applied the law, appellate review is limited to ascertaining whether there has been an abuse of discretion.[6]

### Termination Statute

■■■ The statutory standard for terminating parental rights provides for two separate inquiries.[7] In conducting the first inquiry, the Family Court must find a statutory basis for termination under title 13, section 1103 of the Delaware Code. One of those statutory bases is a parent's failure to plan "adequately for the child's physical needs or mental and emotional

---

1. This Court consolidated the Mother's and the Father's appeals.

2. *Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 730 (Del. 2008); *Solis v. Tea*, 468 A.2d 1276, 1279 (Del.1983).

3. *Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d at 730–31; *In re Heller*, 669 A.2d 25, 29 (Del.1995).

4. *Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d at 731; *In Interest of Stevens*, 652 A.2d 18, 23 (Del.1995).

5. *Id.*; *Solis v. Tea*, 468 A.2d at 1279.

6. *Powell v. Dep't of Servs. for Children, Youth, & Their Families*, 963 A.2d at 731.

7. *Shepherd v. Clemens*, 752 A.2d 533, 536–37 (Del.2000).

health and development." [8]  In conducting the second inquiry, the Family Court must determine what is in the best interest of the child in light of the following factors:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

(2) The wishes of the child as to his or her custodian or custodians and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to their child under [section] 701 of this title;

(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense. [9]

The State has the burden of proof and must satisfy both inquiries by clear and convincing evidence. [10]

### Mother's Incarceration

The Respondents argue that the Family Court erred by not considering the Mother's incarceration in its "failure to plan" analysis.  Specifically, the Respondents argue that the "Mother had only about one-half of the time that other parents are afforded to complete her case plan due to her wrongful incarceration."  The record reflects that the Family Court was aware of the Mother's incarceration.  The Family Court did not, however, rely on that fact in its "failure to plan" analysis.  Instead, the Family Court relied on the Mother's financing and housing problems, substance abuse issues, and criminal history.  As to Mother's visitation with Nathan, the Family Court found the Mother failed to attend visits even when she was not incarcerated.  The Mother admitted that the prison in which she was incarcerated offered programs that her case plan required, and

---

**8.** Title 13, section 1103(a) relevantly provides:

The procedure for termination of parental rights ... may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist:
(5) The parent or parents of the child ... are not able, or have failed, to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met:
5. Failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child.  In making a determination under this paragraph, the Court shall consider all relevant factors, including:

A. Whether the conditions that led to the child's placement, or similar conditions of a harmful nature, continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the respondent to discharge parental responsibilities so that the child can be returned to the respondent in the near future; [or] ...
C. The respondent's ability to care for the child, the age of the child, the quality of any previous relationship between the respondent and the child or any other children....

Del.Code Ann. tit. 13, § 1103(a).

**9.** Del.Code Ann. tit. 13, § 722(a).

**10.** *In Interest of Stevens*, 652 A.2d at 23.

that she failed to take advantage of those opportunities. Although the Mother was incarcerated during a portion of the reunification effort, she demonstrated an inability to complete her case plan elements and discharge her parental responsibilities throughout the entire reunification process. Accordingly, the Respondents' first claim of error is without merit.[11]

### Failure to Plan

■ The Respondents' second argument is that the Family Court erred in terminating their parental rights because they were "reasonably foreseeably capable of reunification with [Nathan] and had substantially completed case plan elements." The relevant inquiry is "[w]hether the conditions that led to the child's placement . . . continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable [ ] [R]espondent[s] to discharge parental responsibilities so that the child can be returned to [ ] [R]espondent[s] in the near future."[12] The record reflects that the Respondents did not complete significant case elements of their case plans and consistently demonstrated their inability to discharge their parental responsibilities.

The Mother agreed to address the following problems in her reunification plan: financial management; daily routine for child; current substance abuse; and legal issues. The reunification plan required the Mother to certify progress by, for example, "provid[ing] DFS proof of employment or other income," and "complet[ing] a substance abuse program." The DFS treatment worker assigned to this case, Ms. Deon Toon, testified that the Mother failed to complete a substance abuse program and failed to provide any pay stubs for a job. The Mother also has a troubling criminal record and missed several visits with Nathan.

The Father agreed to address the following problems in his reunification plan: daily routine for child; current substance abuse; financial stress; and housing problems. The reunification plan required the Father to certify progress by, for example, "provid[ing] DFS proof of employment or other income," and "maintain[ing] a safe and stable residence for himself and his child." Toon testified that the Father failed to "provide any proof of income outside of when he worked in Philadelphia" and failed to provide safe and secure housing.[13] Toon also testified that the Father had trouble paying rent and his electricity bill. In fact, Delmarva Power shut off the Father's electricity, but thereafter the house was illegally powered because "someone broke the meter housing, took the meter off, [and] installed jumpers behind it to get free electric." A Delmarva Power employee testified that the rig "could have easily burned [Father's] house to the ground." Toon testified that Na-

11. The Respondents argue that *In re Max G.W.*, 293 Wis.2d 530, 716 N.W.2d 845 (2006) requires reversal of the Family Court's order. In *Max G.W.*, the Supreme Court of Wisconsin concluded that a lower court "improperly deemed [a parent] unfit *solely by virtue of her status as an incarcerated person* without regard for her actual parenting activities or the condition of her child . . . ." *Id.* at 861 (emphasis added). Here, *Max G.W.* does not apply because, in concluding that Mother failed to plan, the Family Court focused on Mother's actual parenting activities and abilities, and

not at all, let alone *solely,* on her status as an incarcerated person.

12. Del.Code Ann. tit. 13, § 1103(a)(5)a.5.A. *See also Powell v. Div. of Family Servs.,* 12 A.3d 1155, 2011 WL 252950, at *2 (Del. Jan. 27, 2011).

13. Toon testified that the Father did complete a parenting class and a substance abuse program.

than visited the Father at that house. The Father also has a substantial criminal record, which includes convictions for trafficking cocaine, maintaining a dwelling, and carrying a concealed deadly weapon. At the time of the hearings, the Father also had several charges pending, including drug trafficking, theft of services, and disorderly conduct.

The Family Court's factual findings that both of the Respondents had "failed to plan" for Nathan are sufficiently supported by the record, are not clearly wrong, and are the product of an orderly and logical reasoning process.[14] The Family Court correctly applied the law to those factual findings in concluding that the Respondents had failed to plan under title 13, section 1103(a) of the Delaware Code. Accordingly, the Respondents' second claim of error is without merit.

### *Best Interest Analysis*

■ Finally, the Respondents argue that the Family Court abused its discretion in concluding that it was in Nathan's best interest to terminate the Respondents' parental rights. The record reflects that the Family Court enumerated each of the best interest factors and recounted the evidence that it deemed relevant under each factor.[15] The Family Court also weighed testimony and made factual findings, which guided its decision. The Family Court concluded that six of the eight best interest factors favored termination of parental rights. The Respondents have not shown that the Family Court abused

its discretion in performing the best interest analysis.

### *Conclusion*

The judgments of the Family Court are affirmed.

---

14. *See Powell v. Dep't of Servs. for Children, Youth & Their Families*, 963 A.2d at 731; *In Interest of Stevens*, 652 A.2d at 23.

15. The following facts are illustrative of the voluminous testimony contained in the record of these proceedings. First, when Nathan visited with the Respondents, he often cried. Second, Nathan now lives in a foster home

with his half-brother, with whom he is "very bonded." Third, Nathan refers to his foster parents as "Mommy" and "Daddy," and his foster mother described his demeanor when he is in the foster home as follows: "[h]e's a happy, energetic, very well-mannered, handsome little boy, just a nice little boy."