IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JACK MITCHELL, | § | |
| | § | C.A. No. 174, 2023 |
| Respondent Below, | § | |
| Appellant, | § | Court Below—Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. 22-10-04TN |
| RACHEL and JOSHUA | § | Petition No. 22-21367 |
| THAYER, | § | |
| | § | |
| Petitioners Below, | § | |
| Appellees. | § | |

Submitted: January 10, 2024
Decided: January 29, 2024
Corrected: January 30, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Family Court of the State of Delaware. **REVERSED AND REMANDED.**

Regina S.E. Murphy, Esquire and Amy E. Tryon, Esquire, Barnes & Thornburg LLP, Wilmington, Delaware, *for Appellant Jack Mitchell.*

Dana L. Reynolds, Esquire, Law Offices of Dana Reynolds, LLC, Wilmington, Delaware, *for Appellees Rachel and Joshua Thayer.*

**GRIFFITHS**, Justice:

Our nation's highest court has recognized that natural parents have a fundamental liberty interest in the custody of their children.[1] There are fewer bonds more profound than the one that binds parents and their children. When a court considers whether to sever such a bond through the termination of parental rights, the burden of proof is clear and convincing evidence that the statutory grounds for termination are met.

This case, as the Family Court acknowledged, is a difficult and unusual one. Exactly six months after the guardians assumed custody of the minor child, they filed for termination of the natural father's parental rights for one of his children. The Family Court granted the petition. It found that the child's guardians had proven by clear and convincing evidence that the natural father had intentionally abandoned the child for a consecutive six-month period in the twelve months preceding the petition and that the "best interests" factors favored termination of his parental rights.

This is a challenging case that will inevitably cause unhappiness and emotional upheaval for some of the participants. The guardians undoubtedly love the minor child and have cared for him for most of his young life. But there is not

---

[1] *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

clear and convincing evidence in the record to support the Family Court's holding that the father intentionally abandoned the child, and we therefore REVERSE the trial court's judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

Jack Mitchell is the biological father of J.M., born on November 21, 2021.[3] J.M.'s biological mother, V.H.,[4] passed away unexpectedly a few weeks after giving birth to him.[5] Mitchell and V.H. also have two older children, M.M. and L.M., both of whom remain in Mitchell's custody.[6]

When J.M. was born, Mitchell reached out to a caregiver, Bianca Franco, for childcare assistance with M.M. and L.M.[7] In the months following V.H.'s passing, several people helped Mitchell care for the three children, including his father, his father's girlfriend, and Franco and her husband.[8] In December 2021, Franco contacted co-workers at the hospital where she worked as a nurse to see if anyone

---

[2] The facts, except as otherwise noted, are taken from the transcript of hearing testimony. *See* Am. App. to Opening Br. at A55–529 (Hearing Transcript [hereinafter "Hrg. Tr. at [_]"]).

[3] The Court assigned pseudonyms on appeal pursuant to Del. Supr. Ct. R. 7(d).

[4] V.H. also has three other children who are not related to Mitchell. Am. App. to Opening Br. at A393 (Jack Mitchell Testimony [hereinafter "Mitchell Test. at [_]"] at 89:7–8). The three other children are in the custody of their biological father. *Id.* at A432 (Mitchell Test. at 128:1–16).

[5] Am. App. to Opening Br. at A19; *id.* at A400 (Mitchell Test. at 96:1–6).

[6] *Id.* at A393, A395 (Mitchell Test. at 89:1–6, 91:5–6).

[7] *Id.* at A20; A33; A343–44 (Bianca Franco Testimony [hereinafter "Franco Test. at [_]"] at 39:11–40:6); *id.* at A399 (Mitchell Test. at 95:14–18); Opening Br. Ex. A ("TPR Order") at 2.

[8] Am. App. to Opening Br. at A353 (Franco Test. at 49:18–21); *id.* at A404–05 (Mitchell Test. at 100:5–101:6).

3

could assist in caring for Mitchell's children.[9] A co-worker recommended that she contact Rachel Thayer, a fellow nurse at the same hospital.[10] Rachel Thayer and her husband, Joshua Thayer, agreed to provide childcare to J.M.[11]

The Thayers first met J.M. on March 23, 2022, when Franco brought him to their house for a visit.[12] After that visit, the Thayers and Franco began taking turns caring for J.M.[13] On April 1, 2022, Mitchell and the Thayers met for the first time.[14] At the time, Mitchell was struggling with V.H.'s death and was living in a motel with his two other children.[15] Franco and the Thayers continued to share childcare responsibilities until April 6, 2022, when Mitchell was arrested on an outstanding Maryland warrant.[16] The following day, Mitchell, Franco, the Thayers, and Marcia Glover, a social worker for the Division of Services for Children, Youth, and their Families ("DSCYF") who was assigned to the matter, held a safety plan meeting to ensure that the children would be cared for in his absence.[17]

---

[9] *Id.* at A352 (Franco Test. at 48:5–16); TPR Order at 2.

[10] Am. App. to Opening Br. at A352 (Franco Test. at 48:8–13); TPR Order at 2.

[11] Am. App. to Opening Br. at A353 (Franco Test. at 49:12–17); *id.* at A179 (Rachel Thayer Testimony [hereinafter "R. Thayer Test. at [_]"] at 125:4–14); TPR Order at 2.

[12] Am. App. to Opening Br. at A179 (R. Thayer Test. at 125:18–22); TPR Order at 2.

[13] Am. App. to Opening Br. at A354–55 (Franco Test. at 50:5–51:24); *id.* at A182–83 (R. Thayer Test. at 128:8–13, 129:3–9); TPR Order at 2.

[14] Am. App. to Opening Br. at A184 (R. Thayer Test. at 130:5–8); TPR Order at 10.

[15] Am. App. to Opening Br. at A402 (Mitchell Test. at 98:1–7); *id.* at A99 (Marcia Glover Testimony [hereinafter "Glover Test. at [_]"] at 45:5–9); TPR Order at 2, 9.

[16] Am. App. to Opening Br. at A355 (Franco Test. at 51:22–24); *id.* at A189 (R. Thayer Test. at 135:3–16); TPR Order at 2. Mitchell was released later that day. *See* Opening Br. at 2 n.4.

[17] Am. App. to Opening Br. at A94–98 (Glover Test. at 40:9–41:2, 42:13–44:6); TPR Order at 2. Glover testified that she is considered an "investigator" and that "any time a report comes through

At the April 7, 2022 meeting, Mitchell indicated that he would agree to the Thayer's appointment as J.M.'s guardians.[18] On April 12, 2022, Mitchell officially consented to the Thayers serving as guardians of J.M.[19] Mitchell was not present at J.M.'s guardianship hearing in May 2022 because he was incarcerated in Maryland for a period of two and a half weeks.[20] Due to Mitchell's brief incarceration, DSCYF took custody of M.M. and L.M. temporarily, but promptly returned custody to Mitchell when he was released from prison.[21] On May 25, 2022, the Family Court awarded guardianship of J.M. to the Thayers.[22]

By the end of summer 2022, Mitchell had moved into a house with M.M. and L.M. and had started his own business.[23] On September 30, 2022, Shannon Ruello, a family crisis therapist for DSCYF, was assigned to J.M.'s case.[24] At that point,

---

the hotline, it is assigned to a worker and then [DSCYF] go[es] out and [] investigate[s] if the family needs additional services then the case would be referred to a treatment worker[.]" Am. App. to Opening Br. at A94–95 (Glover Test. at 40:21–41:1).

[18] *Id.* at A188–89 (R. Thayer Test. at 134:18–135:1); TPR Order at 2.

[19] TPR Order at 2.

[20] Am. App. to Opening Br. at A408 (Mitchell Test. at 104:13–17); TPR Order at 3, 8; Opening Br. at 2 n.4.

[21] Am. App. to Opening Br. at A95–96 (Glover Test. at 41:3–42:9). Glover testified that DSCYF took custody because they "didn't know how long Mr. [Mitchell] was going to be in jail" and they wanted to ensure that someone could make medical decisions for L.M., who suffers from asthma. *See id.* The children were returned to him shortly after he was released because there were no safety concerns for M.M. or L.M. *See id.*

[22] TPR Order at 3.

[23] *Id.* at 9.

[24] Part of Ruello's job is to "work with families after they've been investigated by [DSCYF] and they're transferred to the treatment unit[.]" Am. App. to Opening Br. at A129 (Shannon Ruello Testimony [hereinafter "Ruello Test. at [_]"] at 75:18–20). She "work[s] with the families to either

J.M.'s case had been transferred to treatment because Glover did not have any actual safety concerns.[25] During their initial meetings in October, Mitchell told Ruello that he wanted to reunite with J.M.[26]

On October 7, 2022, exactly six months after Mitchell consented to the Thayers's guardianship of J.M., the Thayers filed a petition for termination of Mitchell's parental rights on the basis that Mitchell had intentionally abandoned J.M. (the "TPR Petition").[27] Mitchell answered the TPR Petition on November 4, 2022.[28] The same day, he filed an affidavit expressing his indigence and asked the Family Court to appoint him counsel.[29] On November 22, 2022, Mitchell filed a petition (the "Guardianship Rescission Petition"), motion, and affidavit for an emergency *ex parte* order seeking immediate rescission of the Thayers's non-relative guardianship of J.M.[30] The Family Court denied the *ex parte* motion the same day.[31] On December 14, 2022, the Thayers answered the Guardianship Rescission Petition, arguing that the reasons for establishing the guardianship continued to exist.[32] On

---

reunited with their children from out of home placement or maintain safety and structure in the home so that they can continue residing in the home." *Id.* at A130 (Ruello Test. at 76:3–6).

[25] *Id.* at A132 (Ruello Test. at 78:7–9).

[26] TPR Order at 9.

[27] Am. App. to Opening Br. at A324 (R. Thayer Test. at 20:7–12); TPR Order at 3.

[28] Am. App. to Opening Br. at A13; TPR Order at 3.

[29] TPR Order at 3.

[30] Am. App. to Opening Br. at A14–28; TPR Order at 3.

[31] Am. App. to Opening Br. at A54; TPR Order at 3.

[32] TPR Order at 3.

December 20, 2022, the Family Court concluded that Mitchell met the standard for indigency and appointed counsel to represent him.[33]  On January 5, 2023, Mitchell filed a second *pro se* motion and affidavit for an emergency *ex parte* order seeking immediate rescission of the Thayers's guardianship of J.M., which the Family Court also denied.[34]

On January 23, 2023, Mitchell moved for a continuance of the termination of parental rights hearing (the "TPR Hearing").[35]  He argued that his Guardianship Rescission Petition should be decided before the TPR Hearing.[36]  The Thayers answered the continuance motion on January 31, 2023.[37]  On February 6, 2023, J.M.'s guardian *ad litem* indicated that she did not oppose Mitchell's continuance motion.[38]  The Family Court denied the continuance motion on February 7, 2023 and noted that Mitchell could "present evidence regarding his ability to resume custody as part of the 'best interest' analysis" and that his "petition[,] filed after the alleged abandonment period[,] [wa]s not a reason to continue the [TPR Hearing]."[39]

---

[33] Am. App. to Opening Br. at A29–30.
[34] *Id.* at A31–42; TPR Order at 3; Opening Br. at 3.
[35] Am. App. to Opening Br. at A43.
[36] *Id.*
[37] *Id.* at A47–50.
[38] *Id.* at A52.
[39] *Id.* at A54 (Feb. 7, 2023 Continuance Order).

The two-day TPR Hearing occurred on February 23, 2023 and March 28, 2023.[40] During the TPR Hearing, the parties presented testimony from eight witnesses, including Mitchell, the Thayers, and Franco.[41] Elizabeth Trachtman, J.M.'s guardian *ad litem*, testified that she did not think it was in J.M.'s best interests to terminate Mitchell's parental rights.[42] Both social workers assigned to J.M.'s case—Marcia Glover and Shannon Ruello—testified that they did not have concerns with Mitchell's ability to care for his children.[43]

The Court issued the order terminating Mitchell's parental rights (the "TPR Order") on April 20, 2023. It concluded that the Thayers had met their burden of establishing that Mitchell had intentionally abandoned J.M. under 13 *Del. C.* § 1103(a)(2)(b) and that it was in the best interests of the child to terminate Mitchell's parental rights.[44] Mitchell timely filed this appeal, arguing that the Family Court erred when it terminated his parental rights.[45]

## II.   STANDARD OF REVIEW

When reviewing a decision by the Family Court to terminate parental rights, we review both the facts and the law, as well as the trial judge's inferences and

---

[40] TPR Order at 1.

[41] *See* Am. App. to Opening Br. at A55–529 (Hrg. Tr.); TPR Order at 2.

[42] *See* Am. App. to Opening Br at A481 (Hrg. Tr. at 177:7–11).

[43] *See id.* at A96 (Glover Test. at 42:6–9); *see also id.* at A134 (Ruello Test. at 80:3–7).

[44] 13 *Del. C.* § 1103(a)(2)(b) (statutory grounds for terminating parental rights based on the parent's intentional abandonment of a child at least six months old).

[45] Opening Br. at 4–6.

deductions.[46] We conduct a limited review of the trial judge's factual findings to ensure they are supported by the record and are not clearly erroneous.[47] We do not disturb findings of fact unless they are clearly wrong and justice requires that we do so.[48] We review the Family Court's decision for an abuse of discretion when the trial judge properly applied the law, and we review issues of law and legal conclusions *de novo*.[49]

## III. ANALYSIS

For the reasons set forth below, we conclude that the Family Court erred in finding, through clear and convincing evidence, that Mitchell intentionally abandoned J.M. Accordingly, the Family Court exceeded its discretion when it terminated Mitchell's parental rights. We therefore reverse and remand this action for proceedings consistent with this Opinion.

**A. The Family Court erred in terminating Mitchell's parental rights.**

We begin our analysis with an overview of the standards for termination of parental rights and intentional abandonment under 13 *Del. C.* § 1103(a)(2)(b). We

---

[46] *Teachem v. Terry*, 56 A.3d 1041, 1045 (Del. 2012) (citing *Brown v. Div. of Family Servs.*, 14 A.3d 507, 509 (Del. 2011)); *see also Tannis v. Moen*, 268 A.3d 754 (Del. 2021) (TABLE) (citing *Wilson v. Div. of Fam. Servs.*, 988 A.2d 435, 439–40 (Del. 2010)).

[47] *Teachem*, 56 A.3d at 1045–46 (citing *Brown*, 14 A.3d at 509); *Tannis*, 268 A.3d 754 (citing *Wilson*, 988 A.2d at 440).

[48] *Sierra v. Dep't of Servs. for Child., Youth & their Fams.*, 238 A.3d 142, 150 (Del. 2020) (quoting *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983)).

[49] *Sierra*, 238 A.3d at 150 (citing *Powell v. Dep't. of Servs. for Children, Youth and their Families*, 963 A.2d 724, 730–31 (Del. 2008)); *Teachem v. Terry*, 56 A.3d at 1046.

then consider whether there was clear and convincing evidence that satisfied those statutory standards in this case.

### 1. Termination of Parental Rights and Intentional Abandonment

The Family Court must have compelling reasons to terminate an individual's parental rights,[50] and must undertake a two-step analysis to determine whether to do so.[51] First, the court must find that a statutory basis exists for termination under 13 *Del. C.* § 1103.[52] If such a statutory ground exists, the court must next determine whether termination of an individual's parental rights is in the child's best interests under 13 *Del. C.* § 772.[53] The petitioner must prove the elements of both steps by clear and convincing evidence.[54]

Here, the Thayers assert that Mitchell intentionally abandoned J.M., which is one of the statutory grounds for termination under 13 *Del. C.* § 1103.[55] To establish intentional abandonment, the Thayers must prove that, for at least six consecutive months of the twelve months preceding the petition, Mitchell (i) failed to

---

[50] *Teachem*, 56 A.3d at 1046 (citing *In re Stevens*, 652 A.2d 18, 24 (Del. 1995)).

[51] *Sierra* at 151 (citing *Shepherd v. Clemens*, 752 A.2d 533, 536–37 (Del. 2000)).

[52] *Teachem*, 56 A.3d at 1046 (citing *Powell*, 963 A.2d at 731; *Shepherd*, 752 A.2d at 537); *Sierra*, 238 A.3d at 151 (citation omitted).

[53] *Sierra*, 238 A.3d at 151 (citing *Shepherd*, 752 A.2d at 537).

[54] *Teachem*, 56 A.3d at 1046 (citing *Barr v. Div. of Family Servs.*, 974 A.2d 88, 94 (Del. 2009)); *Sierra*, 238 A.3d at 151 (citing *Shepherd*, 752 A.2d at 537, 542). Clear and convincing evidence "is evidence that produces an abiding conviction that the truth of the contention is 'highly probable.'" *See In Matter of Martin*, 105 A.3d 967, 975 (Del. 2014) (quoting *In re Bailey*, 821 A.2d 851, 863 (Del. 2003)).

[55] *See* 13 *Del. C.* § 1103(a)(2)(b).

communicate or visit regularly with J.M., and (ii) failed to manifest an ability and willingness to assume legal and physical custody of J.M.[56] In addition to these statutory requirements, a trial judge must also find that an individual had a "settled purpose" to relinquish all parental claims and to forgo all parental duties.[57] To do so, a trial judge must consider evidence of conduct and subjective intent during the six-month period.[58] A respondent's conduct after the six-month period cannot cure abandonment.[59]

### 2. There is not clear and convincing evidence that Mitchell intentionally abandoned J.M.

The Family Court erred by finding that Mitchell failed to manifest an ability and willingness to assume legal and physical custody of J.M. during the period of April 7, 2022 to October 7, 2022, the second requirement under 13 *Del. C.* § 1103(a)(2)(b).

Given the inconsistent statements by Mitchell regarding his feelings about J.M.'s custody status, the Family Court's finding that Mitchell did not display a willingness to assume custody of J.M. during the six-month period could not have been based on clear and convincing evidence. We acknowledge, as the Family Court

---

[56] *See id.*

[57] *Teachem*, 56 A.3d at 1047 (quoting *Cline v. Hartzler*, 227 A.2d 210, 212 (Del. 1967)). "[A] present continuing intent to abandon up to the time of the petition's filing is no longer required." *Id.* at 1047.

[58] *Id.* (citing *In re Stevens*, 652 A.2d at 27).

[59] *Id.* (citing *R. v. T. (In re J.)*, 799 A.2d 349, 360 (Del. Fam. Ct. 2002)).

11

found, that there were points during the six-month period where Mitchell expressed a desire for the Thayers to adopt J.M.[60] For example, Marcia Glover, the first DSCYF social worker assigned to J.M.'s case, testified that there were points when Mitchell told her he might be amenable to adoption:

- **Regarding Mitchell's wishes in July 2022**: "[Mitchell went] back and forth between he wasn't sure if he should put [J.M.] up for adoption or should get him back. He just was still struggling because of housing and employment so he wasn't sure of which route that he [] w[ould] go . . . he would talk about maybe considering putting them up for adoption but he never gave me, like – like, I want to give him up for adoption. It was always like a back and forth. Like you could never get a solid answer from him."[61]

- **Regarding Mitchell's feelings during her assignment to the case**: "[L]ike I said[,] on a few occasions there were times when Mr. [Mitchell] would say that he was open [to] adoption."[62]

And when asked, Mitchell testified as much:

- **Mitchell's dialogue with J.M.'s guardian *ad litem***: "**Q.** Have you ever said that you would be willing to [give] [J.M.] up for adoption? **A.** I did – I did. **Q.** Can you tell me why? **A.** Well, yeah. [This is] the best rollercoaster that I've been on. [It] [i]s ups and down[s] . . . there[] [are] times [] like right now I know that I can handle having my kids back. All my kids back. But there were times that were just so dark, just so unimaginably scary. Just the thought of it, when [it]

---

[60] *See, e.g.*, TPR Order at 8 (citing Mitchell's June 29, 2022 text message to R. Thayer expressing how guilt-ridden he was for missing milestones in J.M.'s life "but then [he] had to abandon [J.M.]"); *id.* (citing Glover's July 12, 2022 email to R. Thayer that Mitchell "wanted to allow [her] and [her] husband to adopt [J.M.].").

[61] Am. App. to Opening Br. at A84–85 (Glover Test. at 30:23–31:7).

[62] *Id.* at A100 (Glover Test. at 46:9–11).

came down to it, what's going to be better for [J.M.]? I've been living in a hotel . . . I can't find them a place there, you know what I mean? Like, his mom is gone and you just start doubting yourself and I would doubt myself. And so I started thinking about it, but in another way, I never want[ed] to do it."[63]

But the record shows that Mitchell did not express an openness to adoption for a continuous six-month period, and the Family Court did not credit record evidence that indicates Mitchell voiced a willingness and desire to assume legal and physical custody of J.M. For example, at numerous points during the six-month period, Mitchell described the longing he and his children had to be reunited with J.M.:

- **June 29, 2022 text message from Mitchell to Rachel Thayer**: "[You] guys have no idea how guilt ridden I am over this. I missed every mile[]stone. It's bad enough he isn't [going to] know [V.H.] but then I had to abandon him. [I don't know] how to come back from [this]. [M.M.] and [L.M.] ask [about] him every[]day and are scared they [are] [going to] [lose] him . . . but I tell th[em] they don't need to worry he is coming home once we get settled []in."[64]

- **June 30, 2022 text message from Mitchell to Rachel Thayer**: "If [you] have time tomorrow I'd like to come see [J.M.][,] [you][,] and [your] husband and I just [want to] thank [you for] everything. I know how hard [it's going to be] on you guys once we start switching everything back. . . . [W]hen I get [J.M.] back I don't want [you] and [your husband] out of his life. . . . I want [J.M.][,] [M.M.][,] and [L.M.] knowing that we are all family . . . I miss my son.[65]

---

[63] *Id.* at A416 (Mitchell Test. at 112:8–24).

[64] Am. App. to Opening Br. at A809.

[65] *Id.* at A810.

This was further corroborated by testimony from Glover who testified that during the six-month period, Mitchell expressed a desire to have J.M. back once he got back on his feet.[66] And the Family Court observed that "it is evident there were times [Mitchell] manifested a willingness to assume legal and physical custody of [J.M.] to third parties like [DSCYF social worker] [Shannon] Ruell[o]."[67] Specifically, Ruello stated that when she first interacted with Mitchell, "he expressed to [her] that he wanted to be reunited with his other child, [J.M.]" and that "it was something that he had been working on to resolve over the months prior to" her being assigned to J.M.'s case to develop a reunification plan.[68] He also told her at their first meeting that he didn't want J.M. to be adopted.[69]

Similarly, the record does not, by clear and convincing evidence, support the court's conclusion that Mitchell failed to manifest an ability to assume legal and physical custody of J.M. for a continuous six-month period. The Family Court found that Mitchell's ability to assume legal and physical custody manifested *after* October 7, 2022. But it also found that Mitchell created his own business, began living in a

---

[66] *Id.* at A100 (Glover Test. at 46:11–16) ("[T]hen when he got on his feet and got an apartment and started going to grief counseling and his kids were crying and asking to see [J.M.] more, he wanted his [son back] . . . he started to express that but at that point I'm like towards case transfer.")

[67] TPR Order at 9.

[68] Am. App. to Opening Br. at A131 (Ruello Test. at 77:16–17, 77:20–22); Opening Br. at 14.

[69] Am. App. to Opening Br. at A132 (Ruello Test. at 78:16–23) ("[H]e brought up that he doesn't want [J.M.] to be adopted. It was a situation where that had been brought up throughout . . . [the] investigation. People had talked about, you know, adoption and I said is that something you are wanting to do? And he had said no, not at all. He said he wanted to get his son back. He just expressed going through a very hard time.").

14

house in September 2022, was able to care for his other two children, and was working part-time as a mechanic in October 2022.[70] In addition, Glover testified that she did not have any concerns about Mitchell's parenting of M.M. and L.M. during the six-month period.[71] And Ruello testified that she felt Mitchell had prepared his home for J.M. and that she did not have any concerns, safety or otherwise, with his living space.[72] J.M.'s guardian *ad litem* also expressed similar sentiments.[73]

The Family Court's determination that Mitchell failed to manifest an ability to assume legal and physical custody of J.M. for a continuous six-month period is grounded in certain of its findings as to Mitchell's actions—such as being incarcerated for brief periods, not frequently visiting and having a questionable bond with J.M., and not offering clear testimony on his finances and income.[74] And while reasonable minds can differ, especially in such a difficult case, these findings are not enough to meet the high evidentiary burden here. The record shows that Mitchell took steps during the six-month period toward reuniting with J.M.

---

[70] TPR Order at 9.

[71] Am. App. to Opening Br. at A96 (Glover Test. at 42:6–9).

[72] *Id.* at A134–36 (Ruello Test. at 80:16–82:4).

[73] *Id.* at A481 (Hrg. Tr. at 7–11) ("My position is still that it's not in the child's best interest to terminate parental rights. He has a home, he has some income, his support system. It wouldn't be best for the child to terminate.")

[74] TPR Order at 9–10, 16.

15

Because we find that there is not clear and convincing evidence that Mitchell intentionally abandoned J.M., we need not address whether Mitchell had a "settled purpose" to abandon J.M. We likewise do not reach the issue of whether the termination of Mitchell's parental rights would be in J.M.'s best interests. Accordingly, we remand this issue to the trial court for further proceedings on the pending Guardianship Rescission Petition.

## IV.   CONCLUSION

For the foregoing reasons, the Family Court erred in terminating Mitchell's parental rights.  Accordingly, we REVERSE the TPR Order.  We REMAND this case to the Family Court for further proceedings consistent with this Opinion. Jurisdiction is not retained.